The court is now in session. Mr. Iorassi, we're ready for you whenever you're ready. Good morning, Your Honor, and thank you, and may it please the court. This appeal presents a straightforward legal question. Was the ASPCA permitted to ignore more than 30 years of Federal Circuit precedent regarding different site conditions in order to avoid reaching a result that the board felt would be, quote, overly legalistic and unjust? The answer, quite obviously, is no. Since this court's decision in 1987 in Stuyvesant Dredging, panel after panel has held that in order to prevail on a differing site conditions claim, a contractor must satisfy a four-pronged test. One of those prongs, which this court has described as a crucial element, is that the contractor must have reasonably relied upon its interpretation of the contract indications. In this case, there is no dispute that the ASPCA expressly found that Grimberg's reliance on its interpretation of the contract documents was unreasonable. In fact, the board variously described that reliance as unreasonable or unjustifiable nearly half a dozen times throughout its opinion below. Counsel, wasn't the board also concerned that the government's reading of the documents was also unreasonable? Yes, Your Honor, the board mentioned the fact that it felt that the government's interpretation of the contract was more unreasonable than Grimberg's. However, the comparison is problematic for multiple reasons. One, it's comparing the government's interpretation of the contract indications to the reasonableness of Grimberg's reliance on the portions of the contract indications for its bid. I think one way to look at this case that makes it more easy to understand and more helpful is this court's decision in HB MAC, which said, and I'm quoting here, the purpose of the differing site conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur. And the way the differing site conditions clause functions is that there's something akin to a quid pro quo between the government and the contractor. That quid pro quo is defined or structured by the differing site conditions claim test that this court has enunciated and has been in existence for 30 years. This is just Toronto. Can I ask, first of all, a factual question? Were there competing bidders for this contract? Your Honor, that's an excellent question. Honestly, I'm not sure of the answer to that. I don't know. The issue has never come up. I can't represent the story in one way or the other. I apologize. And so that sort of was connected in not a very precise way to, I guess, some head scratching I've been doing about your assertion that the position that the board took here and that Grimberg takes here somehow reduces accuracy. Why, at least in a case where there's no competing bidder, which may make a very significant difference, why isn't accuracy served by saying nobody knows what's actually under the ground? We're not going to give the bidder a right to go in and dig a lot of boreholes to figure that out in advance. So what we're going to do is award a contract in which the price reflects everything that is known. Everybody acknowledges there's an unknown. And once the unknown turns into a known because the digging actually starts taking place, then a proper, accurate, reasonable payment will be made for that. Why isn't that accuracy increasing? Well, I think the problem, Your Honor, is that if a contractor is permitted to win an award and without reasonably relying on its interpretation of the contract, what ends up happening is that a decision like that permits the contractor to recover, no matter how reasonable the contractor's interpretation of the contract is, so long as the conditions encountered differ materially from some reasonable contract. I guess I'm trying to just put aside. My question is not at the moment pushing back against your argument about what our case law says about the requirement of reasonable reliance on both the solicitation information and other information that the bidder has. And I'm also putting aside whether Grinberg here, in fact, acted unreasonably in proceeding on the assumption that the two boreholes told it what it needed to know about how much incompetent rock there was going to be in the footprint. Putting that completely aside, I just want to focus on your argument about there being an accuracy problem with proceeding more or less the way the board did. It might be contrary to law, but I want to know why really this is accuracy defeating, as you suggest repeatedly in your brief. The reason being is that, and permit me to maybe tweak the hypothetical a little bit because I think it illustrates why the argument makes sense. If there is more than one bidder, you may be confronted with a situation where two of the bidders look at the contract indications. They do their level best in order to evaluate what those contract indications reveal. They reasonably rely on what in the contract is actually showing what may be underneath the ground. They're looking at the closest borings. They're also looking at the borings that are further away that give much more context to what is going to be underneath the ground. And based on that, they're going to make their best guess as to what they think the job would cost them and what they're going to bid at. And now if, on the other hand, the board's tests were adopted, you could have a third bidder like Grimberg come in and say, we're going to ignore parts of the contract that we don't think help us. It will then enable us to underbid these other two contractors who are trying to comply with the different site conditions test and do the best they can to accurately determine what this job is going to cost. I'm going to underbid them by 5%, 10%, whatever it is. But there is no evidence in this case of underbidding, is there? Like intentional underbidding? No, Your Honor. I don't think that there's any evidence in the record that we've pointed to that suggests that they intentionally did that. Quite frankly, I think, Your Honor, the manner in which this job was bid very much suggests that this wasn't a question of sort of negligence but rather willful blindness. When there was a whole host of contract indications, the contract specifically said, look at these other 38 or 40 borings from the U.S. Amarid site. It didn't say that. It didn't say that. It said that there are other borings, right? It didn't say look at those. No, Your Honor. The geotechnical report specifically counseled that, quote, boring logs from the adjacent planned U.S. Amarid building show the raw conditions in more detail and therefore better describe the general raw conditions in the area. And that's at appendix page 3136 at paragraph B. So what the court did here was they had- Admittedly, they were not even, according to the board, many of those were not even close to the site area. No, I disagree, Your Honor. The board said, and there's no dispute, that the furthest borings away were 500 feet, which is 165 yards or so, which is the length of one block. And there's also uncontroverted testimony from both of Grimberg's own experts. You know, there are two different experts in this case, one during the bidding phase, Alphatech, and one at the trial at the board, Mr. Huer. Both of them agreed that the contract showed varying amounts of incomplete rock. Mr. Huer recognized that some of the U.S. Amarid borings showed up to 20 feet of incomplete rock. Counsel, you said 500 feet, in your view, wasn't far away, but the board expressly said 500 feet was too far away. Did it not? Well, I think the board said that- I mean, why does it matter that you don't think it's far away? Well, I think the reason, Your Honor, is that the board said it is less- That problem is wrapped up into the board's error here, is that the board said it's further away doesn't show as much, or doesn't demonstrate as much light or reveal as much as the closer inborings. However, we're sort of skipping over the major portion, which is that ultimately the board said you have to be- The board said you were unreasonable. Grimberg was unreasonable by relying on only two- Counsel, you're into your rebuttal time right now, but before you sit down, I have one more question, and that is, you know, one of the things that bothers me about this case is that there's repeated discussion about the board making an equitable adjustment, which is what the board was asked to consider in this case, and yet all this talk about the contract requirements, et cetera, didn't the board actually find- didn't the board actually account for any level of unreasonableness by decreasing the amount of the adjustment? The board decreased the amount of adjustment by something like 19%. It gave-it concluded that only two-and-a-half feet of incompetent rock was reasonably revealed by the contract indications, and therefore it said that 80% of the incompetent rock that Grimberg encountered was- Right, right. In other words, this is all an equitable consideration, and they said that under the contract, even if it was unreasonable to rely on two borings, even if they had looked at every single thing that it would be reasonable to look at, at most, it would have been a 20% differential or a 19% differential. That's true, Your Honor, and to be clear, we contest or dispute the fact that that was an accurate representation of what was in the contract indication. That goes to what we, you know, talked about in our jury verdict section of our brief, and even if-no matter what the board had determined in terms of how much incompetent rock should have been expected, when Grimberg failed at-it failed completely to analyze the contract indications, it failed a crucial prong of the test. So even if it only found that there was a half a foot or one foot of incompetent rock, one of the requirements, the crucial one, was that you must be reasonable in your reliance in order to prevail. Can I ask one quick question? I hope it's a quick question. Does the record make clear that when Grimberg submitted its bid, the government, upon reading it, could tell or couldn't tell how much rock Grimberg was including in its price? Your Honor, I don't think that there's any indication in the record, one way or the other, with regard to what the core understanding was when it received the bids initially. I know that when Grimberg encountered this incompetent rock, which I would point out, it encountered on the very first day of drilling exactly what was revealed by the contract indications, and when they submitted their request for equitable adjustment, that's when they said we relied on only these two borings to make our bid. So I know that no later than that point was the core aware, but I don't know that there's any evidence that shows the core was aware of it when they received the bids. Can one tell from any breakdown in the pricing? Like five foot of rock per boring times the number of caissons that were going to have to be dug, that would mean I don't expect any incompetent rock, because five feet is what you need in the competent rock. I think the answer is that it's conceivable if, for example, the contractor submitted a bid that laid out line item by line item every subcontractor's job and how much it was going to cost the general contractor. I don't know whether that's the case in this particular situation where Grimberg may have specifically listed that. Okay. This is Judge Wallach. I'd like to ask a question, please. You indicated... Hello? Yes, Your Honor. Can you hear me? Yes. Okay. You indicated that the government's position was that it wasn't, that the contractor had not intentionally underbid. But it seems to me that at a point, according to the record, at a point the contractor was advised to add an additional amount in an expectation of problems with the rock and said, we don't do business that way, and in effect then made a bid which was lower than it would have been if it had taken into account the possibility of that incompetent rock. Is that not, in effect, underbidding? Well, Judge Wallach, thanks for the question. I believe Judge Toronto asked me whether there was any evidence of intentional underbidding in this case. And what I said was that I don't think that there's specific evidence that they intentionally underbid it. However, the manner in which they bid the contract and what they relied upon, what their own admissions were, with regard to what they looked at, certainly suggested that there was an intention to sort of put on blinders and ignore the rest of these borings that may have, you know, I agree that what you just mentioned in terms of the, we don't bid contracts that way, suggests that that's just their general practice. But I think that there may be a distinction between that and some nefarious intentional effort to sort of like, I don't want to say defraud, but underbid in that manner that maybe Judge Toronto was suggesting. Okay, counsel, you're out of time. You're well out of time. So I will restore two minutes for rebuttal. Thank you, Your Honor. Okay, Mr. Browdy. Thank you, Your Honor. Good morning. May it please the Court. I'm not sure I really want to get into this, but somehow I was the chairman of the construction committee for the American Bar Association back in 1967 and was part of the task force that drafted this clause and what was called the new clause back in 1967 that was published in the Federal Register. And the differing site conditions clause, of course, was one of the three that was established. Nowhere in the clause itself, which we all felt, including the Department of Justice, Herb Jaffe was part of that committee. It was straightforward. Nowhere did these complications come in. It just says for a type one change or a differing site condition, if the contract indicates materially a different condition. Counsel, counsel. Yes. This is Judge Wallach. On page six of the red brief, you say the government deliberately did not take new borings at the actual location of the biolab building and by including, you say, a multitude of boring laws from other project sites, was apparently attempting to nullify the policy of the differing site conditions clause. What's the basis for that statement and what supports your belief that the government deliberately did not take those new borings as a way of nullifying that policy? It's not that they didn't take the borings. It's that they threw in a raft of borings, hundreds of borings that they went through, okay, hundreds of borings that were taken years before on other projects that for this $17 million project, they did not take one deliberate boring in 2009 or when the IFB was going out or about that time in the area at the site. But we're talking about project time. Tens of years doesn't matter as far as that goes, does it? It matters that the words that we had when we drafted this in that Type 1 is at the site. And I hate to say it, Your Honor, but it's location, location, location, like in real estate. That's what counts. And what the core manual of the design recommends is you take the borings at the construction site. The construction site was the foundation work. It wasn't the road work or the roads leading into it. It was the bearing of the deep piers that were being built. Counsel, didn't the Board actually find that some of the borings, not most of them, but some of the additional borings were sufficiently close enough to the construction site that they should have been taken into consideration? Yes. What the Board did when they came up with the two-and-a-half additional feet of incompetent rocks, they went off on our experts, on Grinbergsexpert.edu's report, saying besides the two bookend of borings, DH-11 and DH-12, which was on the north and the south end of the footprint of the building that we were supposed to build, there was others within one football field. Let's say within one football field being 300 feet, Your Honor, that we're talking about. That we're talking about. So what Dr. Euler did was take the five additional borings that were made years before by, I think it was ESS, and include those into the mix, and basically that's where he felt that if you were going to be a prudent, very, very careful bidder, you were going to use the two plus the five, all seven bidders, I mean all seven borings that were close to it. One of the things that everybody seems to be missing is when the government gave these contract indications, they had the boring logs, but they had boring pictures of the actual four-inch casings in the box, okay? And show that the pictures of DH 11 and DH 12, and only those two borings showing how solid it is, that there was no incompetent runs. Photographs. That's the only two photographs of the actual boards that were taken to show that there were no fractures, no voids, or anything else, okay? So he wanted to show the indication. What the government, I don't want to say expert, because you know, who put together, who selected some of the 100 borings that he threw at it here, he wanted to show how variable the material could be, and that's why he put in stuff that was 500 feet away, and the judge even says 1,000 feet away on some of it, to show the variability. And that's where, if I go back to the former question of Zahner, is that what they were doing is trying to void and disclaim what we were doing in 1967, that this was a mandatory required clause for a fixed-price construction contract. Mr. Brown, this is Judge Toronto. Can I just ask you a question that I asked, your opposite number for the government. Were there competing bidders for this contract? Yes, I believe so, and the board, there is in the index, Your Honor, the board questioned Jim Graham, who did the bidding. When you submitted your bids, were there any questions raised by the government? And Jim Graham said no. Did anybody raise any questions with competing bids? Graham said no. The Corps just evaluated our technical submissions. I think it was a $17 million-plus bid and immediately awarded it without any questions being raised. Okay. Another question that I discussed with the government counsel. Were there details in your bid that showed the government that you were not counting on anything more than the five-feet solid rock hole that you needed for each of the piers? I believe so because, Your Honor, and it's a very good question. I hate to say that because that's all I ever hear on television now. Very good question. If I hear that again. Well, you'll let me know if I ask a question that's not a good question. was submit all 46 borings and stated that this was going to be a balanced site and they were going to eliminate almost all rock excavation by using a balanced site and using all for the roads and for the parking lots and stuff like that so that they could eliminate any unnecessary rock excavation. And that was a statement made in their technical proposal. So the government knew that they were. And one of the things when I went, I kind of... I'm sorry, can I just interrupt you and ask one other, I guess, very specific question. Could you or other bidders have asked to conduct your own test borings in the actual footprint or could you or other bidders have asked the government to conduct new test borings in the footprint so that there would be more information directly on the plot of land that had to be dug into? Not... Remember, this is a government security site. I don't know if you know Fort Detrick, okay, but... I've read about it. Yeah, it's a German warfare, you know, and stuff like that. Unfortunately, it's a big deal now, all right? So, you know, just go on that site and dig up... Well, that's why I asked about seeking permission or asking the government to do it. And what was amazing to me... I'm sorry, can you... Mr. Brown, can I... I need to re-ask the question so that you hear it and maybe specifically answer it. Could you have requested that either you be allowed to do new borings pre-contract or could you have asked the government to do new borings? I don't believe so because the idea is if you read the Quorum of Amendments, they do not allow potential contractors to come on site and start digging up government land and going on land. So the answer is no, but we'll leave it to the Department of Justice Counsel to see if you could do that. Certainly you can't do that in 40 days. You'd have to have your own technical... Remember, this is a design-build job. Now, we're going to come in and do our own borings after we get the job, all right, as far as that goes. But that's after we submit the $17 million. And one of the things about the clause, the way it was drafted, is the government gets the benefit. If, in fact, there were... that you didn't have to go through even five feet of rock to arrive at it, the government gets the benefit. That's one of the things that we taught in law school, that it works, you get a downward equitable adjustment. You know, and my textbook says that, okay, that it works both ways. And that's why you don't put in contingencies in your bid, and I have still not figured out what's the difference between a contingency and allowance, okay? An allowance is just how much of a contingency. It's the amount of money. And when we went back, you know, the major case is C.A. Foster that both sides, you know, that all these cases talk about. Foster versus the United States, where the full court that I knew, Orwetka was dead, but Davis and Laramore and Durfee and the chief judge were still there. And it was written by... Schwartz. Child judge, and it was a wonderful opinion. If you read that C.A. Foster, and he says there is no windfalls and no disasters. And, you know, that's the idea of it. And that was the idea of the court finding a jury verdict. Okay, counsel, I think your time is up. Is there a last couple of things you want to say since I'm giving two minutes back to Mr. Irassi? Yes. You know, the idea of what the government who put together this IFB package said, I wanted to show how variable the geist formation in Frederick was. So that's why I put in all the bed of borings that may have been 500 to 1,000 feet away, okay, or certainly more than 300 feet away, to show the variability. And that's why the only way a reasonable bidder, an objective reasonable bidder could bid this job is to use the borings that were closest to the actual foundation work that is in dispute, Your Honor. Okay, thank you, counsel. Let's hear from Mr. Irassi with his rebuttal. Two minutes. Thank you, Your Honor. I'd just like to take a half step back here to make it clear that we are not asking this court to break new ground here. All that we are asking is that all contractors are held to the same standard, the standard that this court has repeatedly announced. This court has said that reasonable reliance is a requirement. And this court also said in International Tech Court v. Winter, which we cite in our opening brief, rather in our reply brief, that reasonable reliance is a question of fact. And so the issue is whether Greenberg showed that the board's decision on a question of fact was final and conclusive or should be set aside. They don't mention the standard. They spend their entire brief making that effort to show that really what the board said about the reliance was not supported by substantial evidence. But we showed that there was an enormous amount of evidence that supported the conclusion that Greenberg here was absolutely unreasonable. And so, you know, Mr. Browdy talked about location, location, location in terms of borings. The Corps of Engineers started with hundreds of borings and narrowed it down to just a few dozen where the Corps thought that it would shed the most light. We explicitly said, look at these borings. They show the conditions of the site. And in fact, on page 32 of our opening brief, we point out that Greenberg in its bid said, look, we worked on the U.S. Amherst site. We're familiar with the cost conditions here, so this is one of the plus factors for our bid. Despite that, they intentionally ignored 95% of the borings that the contract specifically said look at because this is what's going to tell you what's underneath the ground. That's why they were unreasonable and that's why this court should reverse the board's decision flow. Okay. Thank you, counsel. That case has been submitted, and we will turn to the next case.